341 S.E.2d 420

**Betty Sue KIMBLE**

v.

**Lawrence Allen KIMBLE.**

**No. 16600.**

Supreme Court of Appeals of West Virginia.

March 12, 1986.

James F. Cain, Elkins, for appellant.

John T. Yeary, Sp. Asst. Atty. Gen., Dept. of Human Services, Charleston, amicus curiae.

Harry A. Smith, III, Elkins, for appellee.

McGRAW, Justice:

The appellant, Betty Sue Kimble, appeals from an order releasing her ex-husband, Lawrence Allen Kimble, the appellee, from his decretal obligation to pay support for their infant daughter based upon his consent for her adoption by the appellant and her present husband. The appellant concedes the propriety of this ruling had the adoption been finalized, but contends that failure to consummate the adoption resulted in a continuation of the appellee's duty to make child support payments. Although we agree that consent to an adoption or an agreement between former spouses to terminate an obligation to make child support payments in exchange for consent to an adoption are alone insufficient to terminate a noncustodial parent's decretal obligation to make child support payments, we hold that, in certain limited circumstances, where the welfare of the child has not nor will not be adversely affected, a custodial parent may be equitably estopped from seeking enforcement of the support obligation of a noncustodial parent who has executed formal consent to the adoption of the child by the custodial parent and the custodial parent's current spouse in exchange for the release of that decretal obligation if the adoption is not consummated to the detriment or disadvantage of the noncustodial parent due to inaction on the part of the custodial parent. Because no determination was made in the instant proceeding with respect to (1) whether the welfare of the child would be adversely affected by the appellee's release from either his past or future support obligation; (2) whether the adoption was not consummated due to inaction on the part of the appellant; and, (3) whether the failure to consummate the adoption has operated to the detriment or disadvantage of the appellee, we must remand the case for further factual development and entry of an order consistent with the opinion to follow.

On October 12, 1982, at the request of the appellant, the appellee executed formal consent to the adoption of his daughter by

the appellant and her husband. The quid pro quo for this consent was an agreement that the appellee would "no longer be responsible for any care or maintenance or support of said child, subject to the Court's approval." Following execution of this instrument, and in compliance with its terms, the appellee apparently ceased making child support payments and exercising his visitation and other parental rights.[1] One year after executing this consent, however, without warning, the appellee, who had never been informed that the adoption proceedings had not been completed,[2] was served a petition for delinquent child support payments, along with a request for modification to provide increased support in the future.

Although, following a hearing on the appellant's petition, the trial court did award delinquent child support that had accumulated through October 1982, it further held that "based upon his execution of a consent to the adoption of the parties' infant child ... [the appellee] is relieved and discharged as of the month of October, 1982, of any further responsibility for child support payments...." The trial court expressly relied upon West Virginia Code § 48–4–1a (1980 Replacement Vol.),[3] which at the time of the hearing provided, in relevant part, that, with the exception of consent given within seventy-two hours after the birth of a child and in the absence of fraud or duress, "no consent or relinquishment of legal custody for the adoption of a child ... shall be revocable." The trial court's apparent view, although unexpressed, was that the irrevocability of the consent automatically severed all ties between the appellee and his daughter, including those involving the appellee's support obligation under the divorce decree.

■■■ The trial court's reasoning, however, appears to be flawed in at least three respects. First, it conflicts with the plain language of the consent agreement, which was expressly "subject to the Court's approval."[4] By the terms of the agreement, disapproval of the adoption by the court would have automatically reinstated the appellee's support obligation. Second, it contradicts West Virginia Code § 48–4–5 (1980

1. Although a hearing in this matter was held below, neither of the parties testified. The transcript of the proceedings reflects only a colloquy between the judge and the two attorneys representing the respective parties. Therefore, there was no testimony concerning the exact date either child support payments or exercise of visitation rights were terminated.

2. There is absolutely no indication in the record as to the reason for failure to consummate the adoption proceedings.

3. At the time of the hearing in this case, West Virginia Code § 48–4–1a (1980 Replacement Vol.), provided that:

Parental consent or relinquishment of legal custody for adoption purposes, if given prior to the expiration of seventy-two hours after the birth of the child, may be revoked by such parent within ten days after the birth of said child. Except as provided in the preceding sentence and except where a court of competent jurisdiction finds that such consent or relinquishment for adoption was obtained by fraud or duress, no consent or relinquishment of legal custody for adoption of a child, whether given by an adult or a minor, shall be revocable: Provided, that a relinquishment of legal custody for adoption of a child given by a minor parent or parents to a licensed private child welfare agency or to the state department of welfare shall be revocable unless the relinquishment was given in compliance with section one [§ 49–3–1], article three, chapter forty-nine of the Code: Provided, however, that the foregoing proviso shall not be construed as precluding a minor parent or parents from consenting to the adoption of his or her or their child by an individual or individuals.

This statute, amended in 1984 and 1985, *see* 1984 W.Va.Acts. Ch. 3; 1985 W.Va. Acts ch. 3, is now found at West Virginia Code § 48–4–5 (Supp.1985).

4. Given this Court's statement in *Bailey v. Bailey,* 127 W.Va. 826, 829, 35 S.E.2d 81, 83 (1945), that, "the parties cannot by contract alter or change the terms of [a divorce] decree," it appears that this limitation on the waiver of child support payments would be mandatory. If, in the present action, the adoption proceedings had continued but were terminated by the court, then the appellee's obligation to make support payments would have been reinstated retroactively to the time consent was executed. *See also* Syl. pt. 2, *State ex rel. Trembly v. Whiston,* 159 W.Va. 298, 220 S.E.2d 690 (1975); Syl. pt. 4, *Corbin v. Corbin,* 157 W.Va. 967, 206 S.E.2d 898 (1974).

Replacement Vol.),[5] the applicable statute at the time of the court's order, which releases parents from all obligations with respect to the adopted child only "[u]pon the entry of [an] order of adoption." The rule is that, until an adoption becomes final, support payments are unaffected. For example, this Court held in the single Syllabus of *Hopkins v. Yarbrough,* 168 W.Va. 480, 284 S.E.2d 907 (1981), that:

> In the absence of fraud or other jurisdictionally cognizable and harmful circumstances in the procurement of a decree for child support, a circuit court is without authority to modify or cancel arrearages of a former husband's child support payments, which payments accrued prior to the date of the adoption of such children by the wife's subsequent husband.

Third, it confounds public policy, which mandates that the welfare of the child is of paramount importance in the resolution of support disputes. *See Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357, 361 (1981). If the execution of consent was alone sufficient to release a responsible parent from the obligation to make support payments, unilateral consent could be fraudulently granted solely in order to avoid paying child support. It is therefore clear that the execution of consent to the adoption of a child by its custodial parent and the custodial parent's current spouse is alone insufficient to terminate a noncustodial parent's decretal obligation to make child support payments, and that the circuit court's order releasing the appellee from his support obligation on this ground must be reversed.

In addition to mere consent to an adoption, however, the form executed by both parties also contained a provision which released the appellee from his decretal child support obligation. As previously noted, however, this Court stated in *Bailey v. Bailey,* 127 W.Va. at 829, 35 S.E.2d at 83, that, "[T]he parties cannot by contract alter or change the terms of [a divorce] decree." This proposition is especially relevant with respect to decretal child support obligations. Courts in several jurisdictions have invalidated agreements between former spouses which released the noncustodial parent from a decretal obligation to make child support payments. *See* 100 A.L.R.3d 1129, at § 4(c) (1980), *but see* 100 A.L.R.3d 1129, at § 4(a).

In *Armour v. Allen,* 377 So.2d 798, 799–800 (Fla.Dist.Ct.App.1979), the court noted:

> The law is clear that the parents may not contract away the rights of their child for support. Neither may the mother waive the child's right to support by acquiescing in the father's non-payment of support. Child support is a right which belongs to the child. It is not a requirement imposed by one parent on the other; rather it is a dual obligation imposed on the parents by the State.

*See also Smith v. Smith,* 125 Cal.App.2d 154, 164, 270 P.2d 613, 621 (1954) ("A parent may not by any act, conduct, or arrangement of whatever sort shift from his shoulders the legal responsibility and moral duty to support his minor child. It is an absolute, inalienable right enjoyed by the child which no form of contract between the parents, nor change of the domestic circumstances of either of them, may effect."); *Weaver v. Garrett,* 13 Md.App. 283, 287, 282 A.2d 509, 511 (1971) ("Child support is not a debt, but a duty."); *Sayre v. Sayre,* 129 Mich.App. 249, 252, 341 N.W.2d 491, 492 (1983) ("[M]ichigan law does not allow parents to bargain away the rights of their children."); *Hart v. Hart,* 539 S.W.2d 679, 682 (Mo.Ct.App.1976) ("[T]he parties are not authorized to make an agreement to settle or compromise child support payments. The payments are for the benefit of the child."). Furthermore, as the court observed in *Lang v. Lang,* 252 So.2d 809, 812 (Fla.Dist.Ct.App.1971), "[T]he basic right of the minor child to be supported by its parents is not affected by

---

5. At the time of the hearing in this proceeding, West Virginia Code § 48–4–5 (1980 Replacement Vol.), provided, in pertinent part, that, "Upon the entry of such order of adoption, the natural parent or parents ... shall be divested of all obligations in respect to the said adopted child...." This statute, amended in 1984, *see* 1984 W.Va.Acts ch. 3, is now found at West Virginia Code § 48–4–11 (Supp.1985).

an agreement between the parties with respect to such obligations; 'children are not chattels whose rights can be bargained away by parents'; such agreements will be evaluated with the best interest of the child as its criteria." The custodial parent's role as trustee for the child beneficiary was also noted by the court in *Ditmar v. Ditmar*, 48 Wash.2d 373, 374, 293 P.2d 759, 760 (1956), which stated that, "[A] mother has no personal interest in child-support money and holds it only as a trustee.... She cannot waive the children's rights in the support money." *See also Linton v. Linton*, 166 Ind.App. 409, 422, 336 N.E.2d 687, 695 (1975) ("The custodial parent has been analogized to a trustee of the benefits intended for the child."). Finally, the court in *Napoleon v. Napoleon*, 59 Haw. 619, 624, 585 P.2d 1270, 1273 (1978), emphasized the continuing role of the divorce court with respect to ensuring that the welfare of the child remains uncompromised by any diminution of child support payments, "In the light of the mandate of the statute and the continuing jurisdiction of the court over the minor, the agreement, lacking the court's approval, is clearly not a valid and binding agreement, even as between the parties." *See also Morgan v. Morgan*, 275 Ala. 461, 464, 156 So.2d 147, 150, (1963); *Varble v. Hughes*, 205 Ga. 29, 32, 52 S.E.2d 303, 304 (1949); *Brady v. Brady*, 225 Kan. 485, 488–89, 592 P.2d 865, 869 (1979) ("Divorced parents cannot legally reduce child support or terminate the obligation by a contractual agreement or otherwise. It is a right of the child and can only be reduced

or terminated by court order."); *Bordelon v. Bordelon*, 380 So.2d 110, 112 (La.Ct.App. 1979) ("The father's obligation to pay child support is only satisfied by making payments to the mother and the only way a father can relieve himself of the obligation of child support is by proceeding to have the judgment amended, suspended or terminated."); *In re McLemore*, 515 S.W.2d 356, 357 (Tex.Civ.App.1974) ("The parents of minor children do not have the right or power to effect a modification of a court decree without approval of the court. It was the duty of the court to protect the interests of these children and its solemn decrees made in performance of that duty may not be thus diluted."). Accordingly, we hold that a decretal child support obligation may not be modified, suspended, or terminated by an agreement between the parties to the divorce decree.

■ Our inquiry, however, does not terminate with this holding. In addition to the bare consent for adoption and the express agreement between the parties, both the instrument and the circumstances surrounding its execution raise additional issues not expressly addressed by the court below. A search of pertinent authority reveals that courts in other jurisdictions, when confronted with circumstances substantially similar to those presented in the instant proceeding, have rather uniformly held,[6] under theories of either release or equitable estoppel,[7] that consent for adoption may release a noncustodial parent of a decretal obligation to make child support payments.[8]

---

6. In *Holderness v. Holderness*, Ind.App. 471 N.E.2d 1157, 1159–60 (1984), the court did hold that an agreement between divorced parents whereby the former husband consented to the adoption of his children by his former wife's current husband in exchange for her release of his decretal obligation to make child support payments did not satisfy the exclusive statutory procedure for a voluntary termination of parental rights, and therefore did not prevent the wife from petitioning to set aside an order terminating his parental rights and responsibilities entered pursuant to the agreement. The rationale for the court's holding, however, was strictly statutory, and the application of the doctrine of equitable estoppel was not mentioned.

7. This Court has utilized the doctrine of equitable estoppel to enforce an agreement be-

tween parents with respect to child support in an analogous context. In *Grijalva v. Grijalva*, 172 W.Va. 676, 310 S.E.2d 193, 197 (1983), this Court applied the doctrine of equitable estoppel to enforce a divorce settlement agreement adopted in a final divorce decree which prohibited subsequent court modification, and reversed a lower court's reduction in child support payable by a noncustodial father.

8. In addition to release or equitable estoppel, custodial parents, in certain limited circumstances, may be barred by the doctrine of laches from asserting a right to retroactive child support. In *Hartley v. Ungvari*, 173 W.Va. 583, 318 S.E.2d 634, 639 (1984), for example, this Court held that where a mother knew of her former husband's location during an eight year period

In *Harrison v. Smith*, 201 Neb. 21, 28, 265 N.W.2d 855, 860 (1978), the Nebraska Supreme Court held that the divorced wife, by securing the written consent of her divorced husband to the adoption of their child by her current husband, was equitably estopped from asserting a right to child support payments from the time the adoption should have been completed,[9] stating that:

> The divorce court, upon the petition of the mother and her then husband, gave its consent to the adoption. It made a specific finding that the father of the child had given his written consent to the adoption by the then husband of the mother. A further order should have been entered terminating future installments of child support. While the adoption proceedings pending in the county court were not thereafter completed, Delbert [the ex-husband] was not aware that this had not been done. He had every reason to expect they would be completed in a normal manner and that he would have no further responsibility for the support of his child. . . . The securing of the consent of the father to an adoption by another of his child is such action which by its nature should terminate further liability for child support.

Later, in *Williams v. Williams*, 206 Neb. 630, 636, 294 N.W.2d 357, 362 (1980), the court clarified its holding in *Harrison* somewhat by noting that, "There is more required to invoke the doctrine of equitable estoppel than just the father's signing of a consent to adoption form." In *Williams*, 206 Neb. at 636, 294 N.W.2d at 362, where the father was informed approximately three months after signing a consent for the adoption of his daughter by his ex-wife's present husband that the adoption had not been completed due to the separation of his ex-wife from her present husband and that he remained liable for child support, the court distinguished *Harrison* by observing:

> In *Smith*, . . . unlike the instant case, the trial court that had granted the divorce approved the proposed adoption and the former wife and her new husband actually took the child into their home, supported her, cared for her, raised her, and treated her just as if the adoption had been completed. Under such facts, we found it would be inequitable to permit the mother to subsequently seek to enforce the payment of the accrued, but unpaid, child support and, therefore, applied the doctrine of equitable estoppel.

Therefore, the court in *Williams*, 206 Neb. at 638–39, 294 N.W.2d at 363, reversed the trial court's award of summary judgment for the husband, stating that a genuine issue of material fact remained with respect to whether the requisite elements necessary to invoke the doctrine of equitable estoppel were present.

The necessity of establishing the requisite elements of the doctrine of equitable estoppel was further amplified by the Nebraska Supreme Court in *Redick v. Redick*,

---

between their constructive service divorce and the commencement of her action for the award of child support, yet failed to obtain personal jurisdiction during his numerous trips to the State to visit his daughter at which times he contributed approximately $12,000 to her support, she was barred by the doctrine of laches from seeking reimbursement of reasonable past support expenditures she made in support of the child. As the Court stated in Syllabus Point 2 of *Hartley:*

> " 'where a party knows his rights or is cognizant of his interest in a particular subject-matter, but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. This disadvantage may come from death of parties, loss of evidence, change of title or condition of the subject-matter, intervention of equities, or other causes. Where a court of equity sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.' Syllabus Point 3, *Carter v. Price*, 85 W.Va. 744, 102 S.E. 685 (1920); Syllabus Point 2, *Mundy v. Arcuri*, W.Va. [165 W.Va. 128], 267 S.E.2d 454 (1980)." Syl. pt. 5, *Laurie v. Thomas*, 170 W.Va. 276, 294 S.E.2d 78 (1982).

*See also* Syl. pt. 5, *Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W.Va. 310, 288 S.E.2d 139 (1982).

9. In light of the difficulty in ascertaining when an adoption should have been completed, we believe a more workable standard is that the obligation for support is terminated upon execution of the consent for adoption, unless, of course, the parties agree otherwise.

220 Neb. 86, 91–94, 368 N.W.2d 463, 467–68 (1985), where it held that a mother was not equitably estopped from collecting previously ordered child support from her children's adoptive father despite her remarriage to their natural father and the adoptive father's consent to the adoption of the children by their natural father, which was not consummated due to a second divorce of the natural parents, where the adoptive father was not misled to his detriment or prejudice by the mother's conduct. The court stated:

> In this case John [the adoptive father] did not prove that Anne Redick's conduct amounted to a false representation or concealment of material facts or that it was calculated to convey the impression that the facts were otherwise than, and inconsistent with, those which Anne subsequently attempted to assert. At the time of John Redick's granting his consent to adopt, he knew full well that the court might refuse to terminate his rights and refuse to grant the adoption. He knew that the district court for Douglas County had [previously] refused to consent to the adoption and had refused to terminate his child support payment prospectively when he and Anne had earlier applied for termination of his parental rights and his obligation to support the children. There is no indication that consent to adoption alone was a basis for Anne's promise to refrain from collecting child support. Indeed, quite to the contrary, the letters and testimony of both parties indicate the termination of rights and obligations was to occur after the adoption was completed.... The facts of the record indicate that the deal was struck in contemplation of an actual adoption, and it is also clear from the record that the children themselves, whom neither John nor Anne consulted concerning the termination of John's rights, helped put an end to the adoption proceedings.... [A] party invoking the doctrine of equitable estoppel must have changed his position in reliance on the

misrepresentation, to his injury, detriment, or prejudice. In this case John Redick still has all his rights as a father.... John Redick claims that his relationship with his children was damaged when he signed the consent to adopt and cut off his communication with them. This, he says, was done for their benefit. Both Anne and the children have encouraged contact with their father, John Redick, and he has a right to see them. John Redick had ended communication with the children before he signed his consent to adopt; therefore, his argument that he had irreparably damaged his relationship with his children because of his action done on reliance of the termination of his support obligation is not supported by the record. ... John Redick had been the children's legal father for 9 years at the time of his divorce, and continues to be their father. The oldest child was 7 years old and the youngest was 3 years old when John Redick adopted them. Even the oldest child has a much longer and more stable relationship with John Redick than with William C. Piper [their natural father]. John Redick was the person these children thought of as their father. Their connection with Piper was of short duration.

220 Neb. at 91–94, 368 N.W.2d at 467–68. Of additional relevance was the fact that only nine months elapsed between the adoptive father's consent for the children's adoption and mother's application for delinquent child support payments. 220 Neb. at 89–93, 368 N.W.2d at 466–67.

■ In addition to the importance of the conduct of the respective parties to an agreement to waive child support payments in exchange for consent for an adoption, the Iowa Supreme Court, in *Pappas v. Pappas*, 247 Iowa 638, 643, 75 N.W.2d 264, 267 (1956), *overruled on other grounds, Brown v. Brown*, 269 N.W.2d 819, 822 (Iowa 1978), emphasized the primacy of the best interest of the child,[10] stating that:

10. As noted in footnote five, this Court held in *Grijalva v. Grijalva*, 172 W.Va. at 680, 310 S.E.2d at 197, that the doctrine of equitable

estoppel will apply to enforce divorce settlement agreements adopted in a final divorce decree which prohibit their subsequent court modifica-

We do not hold that the defendant father is relieved of his legal duty to support his minor daughter if the best interest of the child requires it. So far as the record shows here, the support furnished by the mother and stepfather of the child is adequate. If a showing be later made that the plaintiff is unable to furnish the proper support, the father's obligation might then be enforced. Our holding here is only that as between the divorced father and mother an agreement under which the latter, for a valid consideration which the former has paid, agreed to release the father from the support clause of a divorce decree is binding upon her.

*See also Merkel v. Merkel,* 247 Iowa 495, 499–500, 73 N.W.2d 75, 77–78 (1955) (husband who, along with former wife, executed formal consent to the adoption of their child by third parties was not liable for child support payments for twenty-seven month period during which child resided with adopting parents prior to finalization of adoption that was terminated by the court at the request of the child who wished to return to her mother).

The circumstances presented in *Schofield v. Schofield,* 260 Iowa 565, 571, 149 N.W.2d 810, 814 (1967), where the court held that the father was released from liability for child support payments by an oral agreement with his ex-wife in connection with his formal consent to the adoption of their child by his ex-wife's second husband, demonstrate that, despite the agreement of the parties and the inequitable conduct of the custodial parent, situations may arise where reinstatement of the noncustodial parent's obligation to pay child support may be appropriate:

> [I]mmediately after delivering the consent to adoption to plaintiff defendant was no longer asked by formal proceedings or otherwise, for support money. He was not contacted at all until November of 1965, 2½ years later, when plaintiff telephoned him to remind him of his duty to support the boy. That this telephone conversation coincided exactly with plaintiff's divorce from her second husband would appear to be an important circumstance. ... For some reason the adoption was not completed and plaintiff then sought to turn back to defendant because, while she had the consent to adoption, she and her second husband had not used it.

Although the court affirmed the trial court's release of the father from his obligation to make support payments, it perhaps recognized that the financial position of the wife might have changed following her divorce from her second husband [11] and was careful to note that, "Upon proper showing, support for the parties' child may still be ordered from the father...." 260 Iowa at 572, 149 N.W.2d at 814. *See also Holderness v. Holderness,* Ind.App. 471 N.E.2d at 1159–60 (second husband divorced wife shortly after consent to adoption executed by first husband prior to institution of adoption proceedings leaving the wife with no support for her children from

---

tion. We were extremely careful to note, however, that "if the modification were sought because the welfare of the children was not adequately protected by the agreement as drafted, the parties' waiver of their right to modification would not bar a court from making necessary changes." 172 W.Va. at 680 n. 2, 310 S.E.2d at 197 n.2. Ultimately, with respect to any dispute between the parents concerning support, the best interests of the children must prevail.

**11.** Although the court in *Peebles v. Disher,* 279 S.C. 611, 614, 310 S.E.2d 823, 825 (S.C.Ct.App. 1983), held that an agreement between the parents of a child which provided that the mother would not attempt to collect past or future child support in exchange for the father's consent to the adoption of his son by the mother's current

husband "does not bar the mother from enforcing the support provisions of the divorce decree irrespective of whether the mother has sufficient assets to assume the father's duty of support," it noted that, "the amount of child support a divorced parent is to pay must be determined by the court after it considers: (1) the needs of the minor child; (2) the incomes, earning capacities, and assets of both parents; (3) the health, age, and general physical conditions of both parents; and (4) the necessities and living expenses of both parents." Obviously, under this formula, a mother's petition for reinstitution of child support payments could be rejected if the respective financial positions of the parties had substantially changed, perhaps through remarriage, making the payment of child support unnecessary.

any source). In this age of serial polyandry and polygamy, children must not be left at the mercy of their parent's coquettish inconstancy. Courts must act affirmatively to ensure that there is no hiatus in the support of minor children.

■ Although not essential to the application of the doctrine of equitable estoppel,[12] two recurring themes in these types of cases are the custodial parent's overwhelming desire for the termination of the exercise of a noncustodial parent's visitation rights and the alienation of the child's affection for the noncustodial parent by the custodial parent both before and after the execution of consent.

For example, in *Rodgers v. Rodgers,* 505 S.W.2d 138, 140–41 (Mo.Ct.App.1974), the court described the circumstances which led to a father's consent for the adoption of his two sons by his ex-wife and her current husband which was held by the court to constitute sufficient consideration to bind the ex-wife to her agreement to release the husband from his support obligation:

> [T]he defendant continued having difficulty exercising his rights to visitation with the children and on at least two occasions the boys fled from his custody.... [T]he defendant received four letters from the children ... wherein he was advised that they did not want to see him at any time, that they hated him, and that if he really wanted to see them

happy, he would not attempt to see them. In March, 1966, when defendant went to pick up the boys at plaintiff's home, plaintiff came out to defendant's car and informed defendant that the boys did not want to go with him; that she did not want him around her or the boys; that she didn't need his money; that she and her husband made $20,000.00 a year and that defendant was to "keep my damn money and stay away from them and stay out of their life." Defendant left without the children and had not seen them again until the date of the court hearing on December 19, 1972.

Although the father continued making child support payments after this incident, a short time later the mother solicited and obtained his consent for the adoption of his two sons by her current husband, which the father assumed had been consummated until over three years later when he was informed by his ex-wife's attorney that one of his sons wanted to go to college and that his ex-wife wanted the arrearages and reinstitution of support payments to finance it. Given these circumstances, the court concluded that:

> [T]he plaintiff by her failure to pursue her legal remedies over so long a period of time lulled the defendant into a false sense of security; that she deprived him of his rights of visitation with the two boys and thereby achieved a result she

---

**12.** Although termination of the exercise of a noncustodial parent's visitation rights or alienation of the child's affection for the noncustodial parent are not absolutely essential to the application of the doctrine of equitable estoppel, some disadvantage or detriment to the noncustodial parent as the result of reliance upon the agreement to waive child support payments in exchange for consent for the adoption must be shown. As this Court stated in Syllabus Point 2 of *Helmick v. Broll,* 150 W.Va. 285, 144 S.E.2d 779 (1965), "It is essential to the application of the principles of equitable estoppel that the one claiming the benefit thereof establish that he relied, to his disadvantage or detriment, on the acts, conduct or representation of the one alleged to be estopped." *See also Mundy v. Arcuri,* 165 W.Va. 128, 267 S.E.2d 454, 456–57 (1980); Syl. pt. 3, *Nisbet v. Watson,* 162 W.Va. 522, 251 S.E.2d 774 (1979); Syl. pt. 1, *Humble Oil & Refining Co. v. Lane,* 152 W.Va. 578, 165 S.E.2d 379 (1969); Syl. pt. 6, *Wallace v. St. Clair,* 147 W.Va. 377, 127 S.E.2d 742 (1962); *Greco v.*

*Meadow River Coal and Land Co.,* 145 W.Va. 153, 164, 113 S.E.2d 79, 86 (1960); Syl. pt. 6, *Stuart v. Lake Washington Realty Corp.,* 141 W.Va. 627, 92 S.E.2d 891 (1956); *McNunis v. Zukosky,* 141 W.Va. 145, 151, 89 S.E.2d 354, 358 (1955); *Fisher v. West Virginia Coal & Transportation Co.,* 137 W.Va. 613, 625, 73 S.E.2d 633, 640 (1952); *Kimble v. Wetzel Natural Gas Co.,* 134 W.Va. 761, 769, 61 S.E.2d 728, 733 (1950); Syl. pt. 3, *Ballard v. Kitchen,* 128 W.Va. 276, 36 S.E.2d 390 (1945); Syl. pt. 3, *Spradling v. Spradling,* 118 W.Va. 308, 190 S.E. 537 (1937); Syl. pt. 3, *Bank of Sutton v. Skidmore,* 113 W. Va. 25, 167 S.E. 144 (1932); Syl. pt. 3, *Toro v. Shilling,* 108 W.Va. 612, 152 S.E. 6 (1930); *Krebs v. Blankenship,* 73 W.Va. 539, 547, 80 S.E. 948, 951 (1914); Syl. pt. 7, *Lazear v. Ohio Valley Steel Foundry Co.,* 65 W.Va. 105, 63 S.E. 772 (1909); Syl. pt. 5, *Mullins v. Shrewsbury,* 60 W.Va. 694, 55 S.E. 736 (1906); Syl. pt. 4, *Norfolk & W.R. Co. v. Perdue,* 40 W.Va. 442, 21 S.E. 755 (1895); *Mason v. Harper's Ferry Bridge Co.,* 28 W.Va. 639, 649 (1886).

very much desired. By failing to advise the defendant ... that the proposed adoption had been abandoned ... she sub silentio allowed the defendant to conclude that the adoptions had been consummated.... We hold therefore that the trial court did not err in sustaining defendant's motion to quash the writ of sequestration.

505 S.W.2d at 146.

A similar scenario was described in *Schofield v. Schofield*, 260 Iowa at 568–69, 149 N.W.2d at 812:

At the time of defendant's first visit [following his discharge from the military] the matter of Robert Bogart, plaintiff's second husband, adopting the boy was discussed but defendant refused his consent.

At the time of another visit to the boy by the defendant ... plaintiff wanted the adoption "and that was the only thing she wanted." Defendant testified that at this second meeting plaintiff made it clear she didn't want anything but the adoption and she wasn't interested in the money. Payment was behind at that time. Plaintiff at that time did not want defendant visiting the boy.

In May of 1963, a summons from a Missouri court concerning collection of the back child support payments was served on defendant's mother in his absence. Defendant states that he immediately called plaintiff. The pertinent part of that conversation follows:

"Q. And what did she say? A. She said yes, she had a summons out for this back child support, and I asked her just what exactly did she want and then she proceeded to make it quite clear that there was only one thing she wanted and this was an adoption. And, it was pretty evident to me that the—that this pressure she was trying to bring on this summons was an attempt to force me to sign this thing....["]

Defendant said that he received the prepared "Consent of Natural Father to Adoption" by mail from plaintiff's attorney, signed it, had it notarized and returned it to the attorney in late July

1963.... Defendant heard no more from plaintiff until 2½ years later in November 1965 when plaintiff was divorced from her second husband, Robert Bogart. Plaintiff then called defendant to remind him of his obligation to support his son. Defendant denied this obligation in light of his claimed agreement. This action was commenced in May 1965 after some effort was made to revive the 1963 action in Missouri.

Finally, in *Anderson v. Anderson*, 63 Ill.App.2d 358, 359–60, 211 N.E.2d 492, 493 (1965), although rejected on evidentiary grounds, the defendant father argued that:

[P]laintiff is estopped from claiming any payments whatever after the adoption was agreed upon in 1960, on the ground that, in reliance upon that agreement, he ceased all communication with the daughter and thereby became estranged from her. He argues that, since the conduct of the plaintiff has caused him to lose any chance he had to cultivate the love and affection of his daughter, it would be inequitable to compel him to pay for the child's support.

Our survey of the manner in which other jurisdictions have addressed this issue in the context of our own law of support and equitable estoppel forms the basis for our holding that where the welfare of the child has not been adversely affected, a custodial parent may be barred by the doctrine of equitable estoppel from seeking enforcement of the decretal obligation of a noncustodial parent who has executed formal consent to its adoption by the custodial parent and the custodial parent's current spouse in exchange for the release of that decretal obligation if the adoption is not consummated to the detriment or disadvantage of the noncustodial parent due to inaction on the part of the custodial parent. Conversely, where the welfare of the child has been or becomes adversely affected, a custodial parent will not be barred by the doctrine of equitable estoppel from seeking reinstatement of the decretal obligation of a noncustodial parent who has terminated child support payments pursuant to execution of formal consent to

its adoption by the custodial parent and the custodial parent's current spouse in exchange for the release of that decretal obligation even if the adoption has not been consummated to the detriment or disadvantage of the noncustodial parent due to inaction on the part of the custodial parent. Furthermore, reinstatement of the decretal obligation of a noncustodial parent who has terminated child support payments pursuant to the execution of formal consent to its adoption by the custodial parent and the custodial parent's current spouse in exchange for the release of that decretal obligation shall be made retroactive to the date on which the welfare of the child became adversely affected by such termination in order that there exists no hiatus in support.

As previously noted, neither of the parties to the instant proceeding testified at the hearing below. Therefore, a number of the issues remain with respect to the application of the doctrine of equitable estoppel. Of particular relevance are questions regarding the conduct of the respective parties both before and after execution of the consent agreement, including the possible estrangement of the appellee and his daughter, and the adequacy of the support provided by the appellant and her present husband.

Accordingly, for the foregoing reasons, the final order in this proceeding is reversed and the case remanded for further factual development and entry of an order consistent with this opinion.

Reversed and remanded.